## Appeal of Brush Electric Company et al.

In an action to compel defendant to specifically perform a contract for the purchase of electric apparatus and supplies, and for damages suffered

NOTE.—Contracts relating to things personal are ordinarily not enforced, unless it appears that there can be no adequate compensation in damages. In such case equity will enforce the agreement. Vail v. Osburn, 174 Pa.

by the plaintiff on account of defendant's refusal to buy such goods from the plaintiff as required by the contract, the basis on which the master found the loss of profits and damages, and his calculations, sustained.

(Argued November 4, 1887.  Decided November 11, 1887.)

October Term, 1887, No. 222, W. D., before GORDON, Ch. J., PAXSON, STERRETT, and WILLIAMS, JJ.  Certiorari to the Court of Common Pleas No. 2 of Allegheny County to review a decree fixing the amount of loss and damage to be paid by the Allegheny County Light Company, defendant, to the Brush Electric Company and John E. Ridall, plaintiffs, in a suit in equity.  Affirmed.

The bill alleged, *inter alia,* that the plaintiffs, the Brush Electric Company (which was a corporation of the state of Ohio, engaged in making and selling electric light apparatus under patents controlled by it) and Ridall & Ingold, its exclusive sales agents in Pittsburgh and Allegheny, had granted to the defendant, the Allegheny County Light Company, the exclusive right of leasing or furnishing for use to others lights and electric lamps of the Brush apparatus, with all accessories appertaining thereto, and to connect such lamps with and operate them by electric generating apparatus furnished by the Brush company and its said agents, the same to be sold to defendant at regular card rates.

That thereafter and on March 31, 1883, the parties entered into the following contract, supplementary to the original con-contract between them:

"And whereas, Said Allegheny County Light Company has been using said Brush apparatus, purchasing the same together with supplies from said Ridall & Ingold, and it is desired that said light company shall continue said use,

"Therefore, It is now agreed by and between the parties that on all future purchases of said Brush apparatus or supplies

---

580, 34 Atl. 315; Bald Eagle Valley R. Co. v. Nittany Valley R. Co. 171 Pa. 284, 29 L. R. A. 423, 50 Am. St. Rep. 807, 33 Atl. 239; Cumberland Valley R. Co. v. Gettysburg & H. R. Co. 177 Pa. 519, 35 Atl. 952; Cornwall & L. R. Co.'s Appeal, 125 Pa. 232, 17 Atl. 427.

For authorities as to loss of profits as an element of damages, see the following editorial notes:  Loss of profits as an element of damages for breach of contract, note to Wells v. National Life Asso. 53 L. R. A. 33; loss of profits of sale or purchase as damages, note to Guetzkow Bros. Co. v. Andrews. 52 L. R. A. 209.

made by said light company from said Ridall & Ingold, or their assignees, there shall be allowed to said light company a discount of 10 per cent from the list price, or such higher rate of discount as may be from time to time allowed to light companies purchasing from agents of said Brush Electric Company. This discount shall be allowed on apparatus and supplies, and shall not include storage batteries or incandescent lamps.

"In consideration thereof, it is agreed on the part of the Allegheny County Light Company, that said company shall not purchase, rent, sell, or use, any other electric arc light apparatus or carbons, except those provided by said Brush Electric Company.

"In witness hereof, the said Ridall & Ingold have hereto set their hands and seals, and the president of said light company has hereto set his hand and affixed the seal of said company, the day and year aforesaid."

That the discount of 10 per cent named in said contract of March 31, 1883, was, as well known to the defendant, to come off from the commissions said agents, Ridall & Ingold, were entitled to receive from the said Brush Electric Company, and an important and the chief consideration, to the said agents and their said principal, was the special agreement of said defendant not to purchase, rent, sell, or use any other electric arc light, apparatus, or carbons, excepting those provided by the said Brush Electric Company, especially as the carbons therein mentioned were, in the use of the electric light, the great article of consumption and of consequent steady, continuous, and large supply.

That after the execution of said contract of March 31, 1883, the said Ingold, of said firm of Ridall & Ingold, assigned his interest in said firm, including his interests in said contracts, to his said partner John E. Ridall, a plaintiff herein.

That each of the said parties, interested in said contracts, continued their business together, in relation to the subject-matter thereof in full and faithful observance and compliance with all the obligations and terms of said agreements, until some time in the summer or fall of the year 1884, when the defendant entered upon, and has ever since continued, and declares its purpose of continuing in, a course of direct violation and disregard of the terms of said agreements in this, "that since that time it has purchased all its carbons used for and in its business, comprising large amounts and frequent purchases, from others, and

wholly of those made and provided and sold by others, than the said Brush Electric Company or its said agent or agents; such others being competitors of said Brush Electric Company, in that part of its business, from whom said agreements were expressly designed and intended to protect it; and this defendant has so done, declaring and still declares that it intended and intends to purchase and use, and to continue purchasing and using such carbons from others than your said orators, notwithstanding the express terms, as aforesaid, of its agreement and obligation contained in said contract of March 31, 1883. And the said defendant has been and is engaged in constructing and making apparatus, machinery, or accessories, or parts thereof, covered by said contract of 1881, as above set forth, excluding the defendant from such right, and it is particularly engaged in making commutators, which is a definite part of said machinery and apparatus, to the especial injury of said Brush Electric Company in its business, which is an important part thereof, of making and manufacturing all apparatus, machinery, accessories, and supplies (including carbons, etc.), in this bill and said contracts referred to."

The prayer of the bill asked: (1) That the contract referred to be declared binding upon the parties; (2) that the defendant specifically perform said contracts; (3) that defendant be enjoined from continuing to construct or make commutators, apparatus, machinery, or accessories, or any parts thereof which are furnished by the Brush company; (4) that defendant be enjoined from purchasing or using any other electric arc light, apparatus, or carbons, except those provided by the Brush company; (5) that defendant make discovery of all carbons, arc lights, or apparatus bought from others than the plaintiffs, and of all commutators, apparatus, machinery, or accessories, made by it or by others than the Brush company; (6) that an account be had, showing the profits or commissions of which plaintiffs have been deprived, and of the damages and losses they have sustained by the conduct of defendant, and that the same be paid to plaintiffs as their respective interests appear; and (7) general relief.

The defendant answered, denying the equities of the bill.

After evidence had been given before a master the bill was dismissed, but on appeal to the supreme court the decree of dismissal was reversed and the court below directed to proceed to a final decree. (See 114 Pa. 574, 7 Atl. 794.)

Thereupon, on March 5, 1887, a decree was entered directing the defendant to "observe and comply with and specifically perform all of the terms of the contracts recited and referred to in the plaintiff's bill filed in this suit, and by the said defendant to be thereby observed, complied with and performed," and enjoining the defendant "from purchasing or using any other carbons excepting those provided by the said Brush Electric Company, and from otherwise violating the terms of said agreement."

The case was referred back to the master, Thomas Herriott, Esq., to state an account between the parties, who reported substantially as follows:

The only question now before the master is the damage suffered by the plaintiffs under the contract of March 31, 1883, on account of defendant refusing to buy "carbons" from the plaintiffs as therein provided. After the execution of this contract the defendant bought from · other parties than the plaintiffs 458,359 carbons; of these 153,500 were one half inch carbons; and the balance, 294,859, were seven sixteenths inch carbons. These purchases continued from December, 1884, to March, 1887.

The agreement of March, 1883, provides that the defendant shall buy all its carbons from the Brush company at the list price of this company, less a discount of 10 per cent or such higher rate of discount as may be given to other light companies buying from the agents of the Brush company.

The master is not able to find from the testimony just what the market price of carbons was. It is true that we have in evidence the price paid by the defendant for all the carbons bought from others than the Brush company; but there is no evidence to show that they were equal in quality to the Brush carbons, and the master does not think that the price paid by the defendant was the market price. Mr. Duncan, the general manager, testifies that while the various manufacturers had a price list, that was nearly uniform, yet the salesmen did not regard this; and while the dealers all sent out price lists, he never found an agent that stuck to the price list. The testimony also shows that the defendant bought carbons as low as $8 per 1,000, while the cheapest carbon made by the Brush company cost $9.40 per 1,000 to make it, and a very large proportion of the carbons

from others than the Brush company were bought at a price much less than cost price for the manufacture of the Brush carbons. The master, therefore, cannot find that the prices in evidence of the purchases made as above are the market prices, and holds that the list prices of the Brush company are to govern in assessing the damages in this case.

Notwithstanding the master is of the opinion that the price list of the Brush company shall govern in assessing the damages in this case, yet it is very difficult to arrive at the damage done. From December 1, 1884, to May 10, 1886, the list price of the Brush company for carbons was $34.38 for ½-inch, and $27.50 for 7/16-inch carbons; and since May 10, 1886, the list price has been $23.75 for ½-inch, and $21.25 for seven-sixteenths carbons. The cost of making these carbons was, from December 1, 1884, to June 1, 1885, $12.75 for seven-sixteenths inch per 1,000; and from June 1, 1885, to January 1, 1886, for same size, $10.85 per 1,000; and from January 1, 1886, to present time, for same size, $9.40 per 1,000. The ½-inch carbons cost to make $2 per 1,000 more than the prices above during the period specified.

If this were the only element the computation of the damage would be easy; it seems, however, that in making carbons there are from 10 to 20 per cent of the lumber put into the oven that come out slightly imperfect but still fit for use; these imperfect carbons are called "seconds." Up to the first of July, 1885, the Brush company did not sell these "seconds," but ground them up and worked the material over again. These "seconds" are in every way made the same and of the same material as the "firsts," or perfect carbons, the only difference in the two being that a short piece at the end of the "seconds" may be burned too hard or may not be quite straight. After July 1, 1885, the Brush company commenced to sell these "seconds" at a price slightly above the cost of making the "firsts," but never made a list price for "seconds." It continued to sell these "seconds," at from $11 to $14 per 1,000, until a short time after the interlocutory decree of March 5, 1887.

From December, 1884, until the Brush company stopped selling "seconds," after the said decree, the only carbons bought by the defendant from the Brush company were "seconds." Seventeen thousand were thus bought during July and August, 1885, and the evidence does not show the number bought after the

decree of March 5, 1887, before the Brush company stopped selling "seconds." The plaintiffs claim that the question of "seconds" should not enter into this case, as they were not sold or considered in March, 1883, when the agreement was signed and there was no list price for "seconds," while the defendant claims that it would have bought nothing but "seconds" during the period for which an account is ordered, and that the damage should be based on the profit on "seconds."

The testimony shows that the "seconds" bought by the defendant from the plaintiffs answered the purpose as well as "firsts," except that they required a little more care in setting. The master thinks, therefore, that if the plaintiffs could have supplied the defendant with all the carbons it needed of the grade of "seconds," the defendant had a right to order these after July 1, 1885. The testimony is not full on this point; the plaintiffs show that "seconds" are an accidental product, varying from 10 to 20 per cent of the carbons put into the kiln, and that the demand for them, during the time they were sold was such that they could not accumulate any stock; they do not show, however, that at any time they were unable to fill any order for "seconds." The master thinks that if he is right in ruling that the defendant can order "seconds," the plaintiffs were bound to furnish this grade, then it is fair, under the evidence, to presume that the supply would be sufficient, unless the plaintiffs show that it would not.

The master, therefore, thinks that damages should be assessed to July 1, 1885, according to the list price of the Brush company for "firsts," and since that time according to the profits on "seconds." Just what the profits are on "seconds" is not clear; the plaintiffs' witness claims the difference between the value of "seconds," at the price for which they are sold, and their value as material to grind over, but does not give the data from which this could be accurately ascertained; the defendant claims that the profit on "seconds" is the difference between the cost of "firsts" and the selling price of "seconds," claiming that it costs just the same to make "seconds" as "firsts." This is the correct view of the cost price as given by plaintiff, based on both "firsts" and "seconds." As the cost of making carbons decreased $1.90 per 1,000 at about the time the company commenced selling "seconds," the master concludes that this decrease was probably due to the increased value of

"seconds" as a marketable product over their value as material.
The selling price of "seconds" varied from $11 to $14 per
1,000; but as the plaintiffs have not furnished exact data as to
the number sold at each price, the master assumes that the lowest
price was $11 per 1,000 for seven-sixteenths inch, and the high-
est price $14 per 1,000 for half inch; and as the difference in
their cost is $2 per 1,000, the variation in price would be $1.
As the master has no means of knowing whether the number sold
at the highest price was many or few, he here again rules that
the burden of showing this is on the plaintiffs, and considers all
the seven-sixteenths inch sold at $11, and all one half inch sold
at $13 per 1,000.   This, supposing the cost of making the half
inch to be $2 per 1,000 more than the seven-sixteenths inch,
would make the profit uniform per 1,000 on "seconds," and
damages are assessed on the number of carbons purchased by the
defendant, as follows:

### Carbons purchased.

| | ½inch. | 7-16 inch. | Profit per M. | |
|---|---|---|---|---|
| From Dec. 1, 1884, to June 1, 1885 | 27,960 | — | $16.20 | $452.95 |
| "    "    "    " | — | 71,899 | 12.00 | 862.78 |
| Average interest from Mar. 1, '85 | — | — | — | 184.20 |
| From June 1, '85, to July 1, '85.. | 6,460 | — | 18.10 | 116.92 |
| "    "    "    " | — | 10,540 | 13.90 | 146.50 |
| Interest since July 1, 1885...... | — | — | — | 31.60 |
| From July 1, '85, to Jan. 1, '86, seconds ................... | 91,000 | both sizes. | 0.15 | 13.65 |
| Average interest from Oct. 1, '85 | — | — | — | 1.43 |
| From Jan. 1, 1886, to Mch. 5, 1887 | 250,500 | both sizes. | 1.60 | 400.80 |
| Average interest from Aug. 1, '86 | — | — | — | 22.00 |
| | | | | $2,232.83 |

| | |
|---|---|
| Of this sum one ninth is due to J. E. Ridall, | $ 268.09 |
| And the balance to the Brush Company, viz.: | 1,964.74 |
| | $2,232.83 |

The plaintiffs filed the following exceptions to the report:

1. That he does not find on the basis that the loss of profits
to the Brush Electric Company, on the carbons bought of others,
was the difference between the list prices of the Brush Electric
Company and the cost, as proved and set out in the report, less
the 10 per cent discount.

2. The master errs, in finding and basing his calculations upon the notion that the plaintiffs would have sold, and the defendant would have purchased, the carbons called "seconds."

3. The master errs, in basing his calculation upon the purchase of "seconds," especially as the evidence clearly indicates (there being nothing to the contrary) that of all the carbons, purchased of others, none of them were "seconds."

4. The master errs in his calculation and estimates, and in his methods of ascertaining and allowing of profits and commissions on said "seconds."

5. The master errs, in not taking such testimony as there was, to wit, that of G. W. Stokeley, as to the cost and value of "seconds" to the Brush company, and thereby placing the cost and value to the said company at not exceeding one half of·the price at which they were sold.

6. The master erred, in not finding upon the basis of the contract, and in undertaking to find respecting an article not contemplated in the contract, and being an accidental product sold exceptionally and without any market or list price.

The exceptions were overruled, and the report confirmed, and a final decree entered, making the above decree of March 5, 1887, final and perpetual, and directing the defendant to pay to the plaintiffs $2,232.83, loss and damages, with costs.

From this decree the plaintiffs appealed, assigning as error the action of the court in not affirming the plaintiffs' exceptions to the master's report.

*D. D. Bruce* and *M. A. Woodward,* for appellants.—There are two main propositions contained in our assignments of error:

First, that the master erred in not treating the ordinary and usual product of manufacture, and sale of carbons—such as this contract of March 31, 1883, necessarily referred to, and of which alone we ever had a "list price," as the articles upon which our loss was to be based and estimated. (See errors, first, second, third, and sixth.)

Second, that if the said departure from the contract, as adopted by the master, was proper, that then he ignored the best and only reliable evidence as to cost or value to us of "seconds" carbons, and gave us but a fraction of the loss which we were entitled to upon that basis. (See errors, fourth and fifth.)

Upon the first question we ask to stand upon our contract

rights, and that the contract be construed in respect to the circumstances surrounding it when it was made.

The imperfect carbons, called "seconds," were then, as at all times, produced by us, but only as a part of the refuse of our manufacture. Others sold them, but we did not. With a fixed customer to whom we could always sell "firsts" at a larger profit, it is equally unreasonable to assume that we would have sold "seconds." And the best evidence that the defendant would not have bought them is the fact that it bought none from others, never buying any but the three lots bought from us, in July, 1885, during its default to us, and when we had first commenced the experiment, since abandoned, of selling them, in place of using them as raw material. To this error our third exception is directed.

By no reasonable argument, therefore, can the master be sustained in admitting the new, uncertain, and complicated subject of "seconds" under our contract.

On the second question, the testimony shows that, if this basis is to govern, fully one half of the price at which the master finds "seconds" to have been sold, would be profit.

At his basis of the average selling price of the 91,000 and 250,500 supposed "seconds" carbons, the profit at one half would have been $2,049.00, and the average interest to July, 1887, $112.69, amounting to $1,723.81 more than the amount allowed by the master.

If we are right on the first proposition, then our profits are of easy calculation, and amount to $6,229.95, with an average interest to July 1, 1886, to be added of $466.17, or $4,253.83 in addition to the amount allowed by the master.

*W. B. Rodgers,* for appellee.—Before the master we contended that carbons had a market price, there being a large number of makers, and therefore the measure of damages was the difference between the cost to the Brush company and the market price. It was on this theory that a calculation was produced before the master, some items of which showed that the market price was less than the cost price as claimed by the Brush company.

But another position taken by us he sustained, which was this: July 1, 1885, the Brush company began to put on the market two grades of carbons, firsts and seconds. Ridall began to sell

these seconds, and so continued until some time in April, 1887, when the Brush company ceased to furnish them. The only purchases made by us of Brush carbons between December, 1884, and March 5, 1887, were of these seconds. These purchases were two orders in July, 1885, and two in August.

Then came the interlocutory decree of March 5, 1887, requiring us to buy none but the Brush carbons sold by Ridall. All our purchases from Ridall from that date, until the Brush company ceased to furnish them, a period of about two months, were of "seconds."

The master took our view and charged us with the profit of the Brush company based on "firsts" from December, 1884, to July, 1885, and on "seconds" from July 1, 1885, to the date of interlocutory decree.

I come now to the argument on the other side. There are two propositions:

First, the contract of March 31, 1883, confined the defendant to the purchase of firsts because they were the usual and ordinary product, and of which alone there ever was a list price, and that the damages should have been fixed on that basis.

Second, that if seconds were to be taken as the basis, then the master ignored the best evidence as to their cost and value.

As to the first proposition, the defendant was not limited to, or bound to buy, "firsts" by the contract of March 31, 1883. The agreement in that paper on the part of the defendant is that it shall not purchase any other "carbons except those provided by the Brush company." "Seconds" were provided by the Brush company; therefore we had the right to purchase them.

But it is said the Brush company never had a list price of seconds; but it cannot be seriously contended that if the Brush company put one or more additional classes of carbons on the market, it could prevent us from buying them by refusing to make a list price. The term list price means the price at which the Brush company sells its goods. Besides that, the term as used in the contract refers merely to the basis upon which the discount to be allowed by Ridall is to be calculated, and nothing more.

The second proposition, for the reasons already given, is radically unsound, either as a mathematical, business, or legal proposition. As a mathematical proposition, it ignores one of the

main elements, the cost of the workmanship in the seconds. As a business proposition, it claims a false rule for profits; and as a legal proposition, it asks the court to assume the value of the materials alone, but gives no certain *data* on which that value could be fixed, although that *data* was in the possession of the plaintiffs alone. The "best and the only reliable evidence" on this subject was that it cost as much to make a second as a first, as the material and the labor were just the same.

PER CURIAM:

An examination of this case fails to convince us that the decree of the court below was in any particular wrong; hence, we refuse to sustain the appellants' exception.

The appeal is dismissed and the decree affirmed, at the costs of appellants.